UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

IN RE:

MOLTECH CORPORATION,
n/k/a/ SION POWER CORPORATION,

CASE NO.:  01-00512-LMK

CHAPTER 11

   Debtor.
_____/

**MEMORANDUM OPINION ON
THE DEBTOR'S MOTION FOR SUMMARY JUDGMENT ON
THE DEBTOR'S OBJECTION TO CLAIM NUMBER 36**

THIS MATTER is before the Court on the Debtor's Motion for Summary Judgment on its Objection to the Claim of Thomas R. Williamson, III.  Docs. 517 and 375.  Mr. Williamson, the Debtor's former President and Chief Operating Officer, claims $3 million in damages for the Debtor's breach of an employment contract and related incentive stock option agreement.  Claim No. 36; Doc. 375.  After considering the affidavits and the record in this case, and drawing all inferences in the favor of Mr. Williamson, it appears that the undisputed facts demonstrate that the Debtor is entitled to judgment as a matter of law.  In particular, no evidence has been produced showing that Mr. Williamson suffered damages as a result of the breach.  Accordingly, the motion for summary judgment is granted; the objection is sustained and the claim is disallowed.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 151, and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

## *FACTS*

The following facts are undisputed for purposes of the Motion for Summary Judgment. The Debtor (Moltech) is engaged in the research and development of potentially promising lithium-polymer battery technology. Docs. 126, Disclosure Statement and 526, Exhibit D. In 1994 and 1995, the revenues from Moltech's speculative venture were derived almost entirely from its research contracts, and no revenues came from production. Doc. 537, Exhibit C-2. Even with advances and outside equity financing supplementing these revenues, there was not nearly enough to pay actual operating costs, and Moltech was operating with significant net losses of almost $1 million in 1994 and almost $3 million in 1995. Doc. 537, Statement of Operations. The uncertainty of the endeavor is further highlighted by the fact that Moltech slid further into debt over time: when the voluntary petition initiating this case was filed on August 21, 2001, Moltech's schedules reflected about $71,285,000 in liabilities and $528,000 in assets. Upon confirmation of the Chapter 11 Plan, Moltech's pre-petition stock was cancelled. Docs. 408 and 446.

Moltech hired Thomas R. Williamson, III to be its President and Chief Operating Officer in January of 1994. As contemplated, Moltech entered into an Employment Agreement and an Incentive Stock Option (ISO) Agreement with Mr. Williamson. In January of 1995, Mr. Williamson was terminated, and shortly thereafter he brought suit in New York State Court for wrongful termination. In that case, he was seeking the actual shares of Moltech stock he claims he was due under of the ISO agreement. The Supreme Court for Erie County in the State of New York denied Moltech's motion for summary judg-

ment on Mr. Williamson's claims on April 7, 1998, concluding that there was a genuine issue as to whether Mr. Williamson had in fact been wrongfully terminated. Doc. 524, Index No. 96-5253. This decision was affirmed in relevant part by the Appellate Division in *Williamson v. Moltech Corp.*, 690 N.Y.S.2d 628, 261 A.D.2d 538 (N.Y. App. Div. 1999).

In 2001, Moltech filed for relief under Chapter 11, and Mr. Williamson filed a claim based on his wrongful termination. Claim No. 36. He now seeks money damages rather than the shares themselves and alleges that his wrongful termination prevented him from exercising his rights under the ISO Agreement, which resulted in the loss of $3 million. Mr. Williamson has consistently asserted that he is seeking money damages for the alleged breach, not specific performance, and he has made no suggestion that this is an action for conversion rather than breach of contract. Moltech objected to the claim and has moved for summary judgment on the objection.

The ISO Agreement at the heart of this dispute granted Mr. Williamson the option to purchase a certain amount of Moltech common stock based on the length of time he worked for the corporation and his achievement of certain objectives spelled out in the Employment Agreement. Doc. 523, Exhibit Part II. The option was to be exercised by delivering a duly completed and executed Stock Purchase Agreement to the Secretary of the Company. Thus, the Employment, ISO, and Stock Purchase Agreements are intertwined, and Mr. Williamson had to bind himself to the Stock Purchase Agreement if he wished to purchase shares under the ISO agreement.

The Stock Purchase Agreement provides Moltech with the right of first refusal and states that Mr. Williamson agreed that the shares were purchased "not with a view to their

resale or distribution." Doc. 523, Exhibit Part II. Mr. Williamson promised that he was "prepared to hold the Purchased Shares for an indefinite period and has no present intention to sell, distribute or grant any participating interests in the Purchased Shares." *Id.* The contract further explains that the shares were not registered under the Securities Act of 1933 or the securities laws of any state, and that the shares were being issued in reliance on exemptions from such laws based upon the representations Mr. Williamson made, outlined above. The stock certificates for Mr. Williamson's shares should have restrictive legends on them making these limits on their transferability apparent, which is often the case for restricted shares. *See* Doc. 523, Stock Purchase Agreement; *see also* 17 C.F.R. § 230.502(d); *S.E.C. v. Cavanagh*, 1 F.Supp.2d 337, 369-70 (S.D.N.Y. 1998).

Therefore, under the terms of the Stock Purchase Agreement, and as confirmed by the uncontroverted affidavits on file, Mr. Williamson's shares were restricted and unsalable. Docs. 523, 534, and 535. Mr. Williamson was able to exercise his option and purchased 8,630 shares in January of 1995. Doc. 523. However, he never sold those shares, Doc. 535, and they were cancelled when the Plan was confirmed on May 6, 2005, Docs. 408 and 446.

### *STANDARD FOR SUMMARY JUDGMENT*

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Bankr. P. 7056 (making Fed. R. Civ. P. 56 applicable to

4

bankruptcy proceedings). The burden is on the moving party to demonstrate that it is entitled to summary judgment as a matter of law, *In re Gurley*, 311 B.R. 910, 915 (Bankr. M.D. Fla. 2001), and all evidence is viewed in the light most favorable to the non-moving party. *Gurley*, 311 B.R. at 915 (citing *Chapman v. AI Transp.,* 229 F.3d 1012, 1023 (11th Cir. 2000)). Nonetheless, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

In accordance with the standard for summary judgment, I must view all facts in the light most favorable to Mr. Williamson. This decision does not address the merits of Mr. Williamson's wrongful termination or breach of contract claims; rather, for the purposes of this motion, Mr. Williamson's allegations of wrongful termination and breach of the ISO Agreement will be taken as true and proven. Thus, the only issue remaining for this Court is damages. Damages is an essential element Mr. Williamson must prove in order to make out a *prima facie* case for a breach of contract claim. *Nat'l Mkt. Share v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2002). If there is no evidence of damages, an essential element of Mr. Williamson's claim is lacking, and summary judgment must be entered against him. *See Celotex*, 477 U.S. at 322-23.

Similarly, in the bankruptcy context, Mr. Williamson must produce at lease some evidence of damages. A properly executed and filed proof of claim is presumed valid and allowed unless a party in interest objects to it. Fed. R. Bankr. P. 3001(f); 11 U.S.C. § 502. The objecting party must introduce evidence with sufficient probative force to rebut the presumption. *In re Gurley*, 311 B.R. 910, 915-16 (Bankr. M.D. Fla. 2001); *In*

*re White*, 168 B.R. 825, 828-29 (Bankr. D. Conn. 1994). If such evidence is introduced, the claimant may then prove the claim by a preponderance of the evidence. *Gurley*, 311 B.R. at 915-16 (citing 8 *Collier on Bankruptcy,* ¶ 3001.05 (15th ed.1995)); *In re Homelands of DeLeon Springs, Inc.*, 190 B.R. 666, 668 (Bankr. M.D. Fla. 1995); *see In re Phillip Watts Enterprises, Inc.*, 186 B.R. 735, 738 (Bankr. N.D. Fla. 1995). Since Moltech has pierced the presumption in this case based on the contracts and affidavits introduced into evidence, it is entitled to summary judgment if Mr. Williamson fails to produce any evidence of damages to support his claim.

### ***DISCUSSION***

The ISO Agreement provides that the stock options would expire in the event of Mr. Williamson's termination for any reason except retirement, death, or disability. However, under New York law, an employer may not benefit from a wrongful termination. *See Williamson v. Moltech Corp.*, 690 N.Y.S.2d 628, 261 A.D.2d 538 (N.Y. App. Div. 1999). Hence, Mr. Williamson is entitled to seek damages for breach of contract under the ISO Agreement. *See id.*

Under the law of New York,[1] damages for breach of contract are awarded in order to put the non-breaching party in the same economic position it would have been if the contract had been performed. *Oscar Gruss & Son v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003); *Boyce v. Soundview Tech. Group, Inc.,* No. 03 Civ. 2159(HB), 2004 WL 2334081, at *2 (S.D.N.Y. Oct. 14, 2004). As a corollary, damages for breach of contract should

---

[1] The parties agree that New York law applies in this case because each of the employment, incentive stock option, and stock purchase agreements contain choice-of-law provisions which dictate that New York law should govern the construction and enforcement of the contracts.

6

not put the non-breaching party in a better position that it would otherwise be. *Terwilliger v. Terwilliger*, 206 F.3d 240, 248 (2d. Cir. 2000). Damages are measured by the difference between the contract price and the "fair market value" of the property calculated at the time of breach, *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000); *Sharma v. Skaarup Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990); *Boyce*, 2004 WL 2334081, at *2-3, and damages should be calculated as of the date of breach, *Oscar Gruss*, 337 F. 3d at 196; *Boyce*, 2004 WL 2334081, at *2.

In cases where the shares at issue were in a private company and not actively traded on any public exchange, the "hypothetical market standard" is appropriate to determine fair market value since there is no traditional market. *Schonfeld*, 218 F.3d at 178; *Boyce*, 2004 WL 2334081, at *3. Under the hypothetical market standard, "fair market value" is the price at which a willing buyer and willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts, would exchange the property at issue. *Schonfeld*, 218 F.3d at 178; *Boyce* 2004 WL 2334081, at *2.

In addition, damages must be demonstrated with reasonable certainty. *See Boyce* 2004 WL 2334081, at *2 (citing *Schonfeld*, 218 F.3d at 172, which stated that both the existence and amount of damages must be established with <u>reasonable certainty</u> and capable of measurement based upon known reliable factors without undue speculation) (emphasis added). Though mathematical certainty is not required, a plaintiff must demonstrate both the existence and amount of damages with reasonable certainty. *Schonfeld*, 218 F.3d at 174. Damages must be measurable, not speculative, possible, or imaginary. *Id.* Damage awards cannot be based on a multitude of assumptions, speculation, or con-

7

jecture. "The entrepreneur's 'cheerful prognostications' are not enough." *Id.* (quoting 1 *Dobbs Law of Remedies* § 3.4).

## *APPLICATION*

In this case, Mr. Williamson has produced no evidence establishing the existence of damages. Breach occurred as the options to purchase the stock became available to Mr. Williamson under the ISO Agreement. At those times, according to the stock purchase agreement and the uncontroverted affidavits presented to this Court, the stock was restricted and unsalable. Docs. 517, 523, and 526; *see also* 15 U.S.C. §§ 77b, 77d and 77e; *Ackerberg v. Johnson*, 892 F.2d 1328, 1335-36 (8th Cir. 1989); *Berckeley Inv. Group Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006); 17 C.F.R. § 230.144. As the cases Mr. Williamson has cited make clear, post-breach evidence should not be considered by the court. Doc. 525 (citing *Oscar Gruss*, 337 F.3d at 196). Since there could have been neither willing buyer nor willing seller at the time of breach, no "hypothetical market" could have existed. All Mr. Williamson would have ended up with is unsalable stock that later became worthless. He has produced nothing to contradict the assertion that the shares were restricted and nontransferable, and he has made no suggestion that any exemption applies. Mr. Williamson has therefore failed to produce any evidence of the existence of damages, which is required for a claimant to make out a *prima facie* case for a breach of contract claim in New York.

This conclusion is verified by the facts. In January 1995, Mr. Williamson exercised his option to purchase shares under the ISO and Stock Purchase Agreements. Doc. 523.

8

Yet, he never sold these shares, even after he was terminated. Doc. 535. This suggests that Mr. Williamson could not have sold the restricted shares he claims he is due.

The fact that an investment banker valued Moltech's stock for tax purposes does not mean that Mr. Williamson's shares were not restricted. The IRS often determines the value of restricted shares for tax purposes and takes the restricted nature of the shares into account when doing so. *See Rev. Rul. 77-287, 1977-2 C.B. 319; see also United States v. Pree*, 408 F.3d 855, 870 (7th Cir. 2005). The fact that the shares may have had some value for tax purposes does not mean that Mr. Williamson could have sold them. *See Pree*, 408 F. 3d at 870. Likewise, the evidence Mr. Williamson submitted relating to the performance of other companies in Moltech's field (Doc. 534) is too speculative to provide the reasonable certainty required to show damages. *See Schonfeld*, 218 F.3d at 174; *see also Blase Industries Corp. v. Anorad Corp.*, 442 F.3d 235, 238-39 (5th Cir. 2006); *McClaran v. Plastic Industries, Inc.*, 97 F.3d 347, 356-57 (9th Cir. 1996).

Even if Mr. Williamson had been able to sell his shares, there is no evidence showing that they had any reasonably certain substantial value at the time of breach. Motlech was making neither product nor profit in 1995. *See* Docs. 536, Exhibit D and 537, Exhibit C-2. At that time, Moltech was losing millions of dollars a year. Doc. 537, Exhibit C-2. Moltech's shareholder equity was negative. Doc. 537, Exhibit C-1. Moltech's revenues came almost entirely from research contracts, and most of the cash Moltech had on hand came from advances on contracts that it had not yet performed. *Id*. In short, Moltech was a research company which did not manufacture anything, s*ee* Docs. 526 and 536, Exhibit D, and which continued on in business with the hope that one day it might even-

9

tually develop a new generation of battery on which it could then finally turn a profit. To date that hope has not been realized, and Moltech has ended up in bankruptcy.

Furthermore, while Mr. Williamson held shares of Moltech common stock, there were five classes of preferred shares that would have been paid dividends before the common shares Mr. Williamson claims. Doc. 526. There were 7,165 shares of preferred stock issued to 30 holders, and 11,496,105 shares of common stock issued to 39 holders. Doc. 1, Petition (Exhibit A). Many of the shareholders acquired their shares in exchange for goods, licenses, or services. Doc. 537, Exhibit C-2. Thus, Moltech stock was not "sold" on a public market. Doc. 526. Of course, there is no doubt that Moltech was able to raise some revenues from investors by issuing its securities under certain conditions in compliance with SEC Regulation D. *See* 17 C.F.R. §§ 230.501 - 230.508. Mr. Williamson, in contrast, was in a completely different position. He could not have sold the restricted shares, and he has made no showing to the contrary.

It has been suggested that Moltech should have to prove that the stock had no value under the "wrongdoer rule," which states that, when the existence of damages is certain, but the amount of damages is uncertain because evidence of the amount of damages is not available due to the wrongdoer's misconduct, the burden of uncertainty should be placed upon the wrongdoer. *Boyce* 2004 WL 2334081, at *3-4 (citing *Schonfeld*, 218 F.3d at 174-75; *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 496 (2d. Cir. 1995)).

The wrongdoer rule does not apply in this case because the existence of damages has not been demonstrated with the requisite certainty. Mr. Williamson has made no showing that the restrictions on the stock were in any way invalid or that any of the conditions under Rule 144 that would have allowed for the transferability of the shares existed at

any point. The party seeking damages must first put on evidence establishing damages with reasonable certainty before the burden of uncertainty is shifted to the breaching party under the wrongdoer rule. *See Schonfeld*, 218 F.3d at 174-75; *Indu Craft*, 47 F.3d at 496; *Boyce* 2004 WL 2334081, at *3-4. Even if the wrongdoer rule did apply in this case, however, Moltech has carried the burden because the evidence indicates that Mr. Williamson's shares had no value.

Finally, a party cannot recover more in damages than it would have gained had the contract been fully performed. *Terwilliger v. Terwilliger*, 206 F.3d 240, 248 (2d. Cir. 2000). In this case, if the contract had been performed, Mr. Williamson would have ended up with worthless stock. Awarding him damages now would put him in a better position he would have been if the contract had been fully performed.

## *CONCLUSION*

In this case, Moltech has submitted evidence supporting its objection sufficient to pierce the presumption of the validity of Mr. Williamson' claim. Viewing all of the evidence in the light most favorable to him, Mr. Williamson has failed to show that he suffered damages. Mr. Williamson is currently in the same position he would have been had the contract been performed with regard to the shares he claims under the ISO Agreement. Even if the contract had been fully performed and he had gotten the shares he claims he is owed, Mr. Williamson would not have been able to sell the shares. And even if he had been able to sell them, they could not have been exchanged for value because they were of *de minimis* value. Thus, Mr. Williamson has not produced any reasonably

certain evidence of damages, which is necessary to establish a claim for breach of contract. As there is no evidence of damages—an essential element of Mr. Williamson's case—Moltech is entitled to summary judgment as a matter of law. Accordingly, summary judgment must be granted.

The Court will enter a separate order consistent with this opinion.

DONE and ORDERED at Tallahassee, Florida this 15th day of December, 2006.

*/s/ Lewis M. Killian, Jr.*

LEWIS M. KILLIAN, JR.
United States Bankruptcy Judge